UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CSC HOLDINGS, INC.,

                Plaintiff,

          -against-

LAMARTINE D'SA,

                Defendant.
------------------------------------------------------------X

**REPORT AND RECOMMENDATION**
CV 02-3241(JS)(ARL)

**LINDSAY, Magistrate Judge:**

      This matter was referred to the undersigned by District Judge Joanna Seybert for determination of the amount of damages to be awarded pursuant to the default of the defendant Lamartine D'Sa ("D'Sa"). Pursuant to the order of the undersigned, plaintiff CSC Holdings, Inc. ("Cablevision") has submitted a memorandum of law in support of its damages claim, the Affidavit of Donald Kempton ("Kempton"), an investigator for CSC, and the Affirmation of Melinda M. Dus, Esq. in support of its application for attorney's fees. Having considered the plaintiff's submissions, the undersigned recommends that the plaintiff be awarded $81,000.00 in statutory damages, and $4,892.00 in attorney's fees.

## DISCUSSION

D'Sa's Default:

      Prior to the instant default judgment, the undersigned had recommended to District Judge Seybert that a default judgment be entered against D'Sa due to his failure to comply with the court's orders and to participate in discovery. Judge Seybert adopted that recommendation and referred the issue of damages to the undersigned. Accordingly, the parties were ordered to file papers regarding the issue of damages. In response to that order, D'Sa advised the court that he

had not received any of the previous court orders. Based upon that representation, the undersigned recommended that the default judgment be vacated and Judge Seybert adopted that recommendation. Plaintiff moved to reinstate the default judgment on account of D'Sa's continued failure to participate in discovery. D'Sa did not oppose that application notwithstanding the fact that the application was served on him by first class mail, return receipt requested. Thus, the undersigned once again recommended that a default judgment be entered and D'Sa did not object to the recommendation despite being given an opportunity to do so. Judge Seybert adopted the report and recommendation and a second default judgment was entered. Judge Seybert also referred the issue of damages and attorneys' fees to the undersigned, which is the subject of this report and recommendation. The undersigned directed Cablevision to serve and file papers in support of its damages claim or advise the court in writing that it would rely on its previous submissions. D'Sa was directed to serve and file papers in opposition. Cablevision has submitted revised papers in support of its claims for damages and attorney's fees, but D'Sa has not submitted any opposition.

Once a default is entered, a defendant is deemed to have admitted all of the well-pleaded allegations raised in the complaint pertaining to liability. Claims for damages, however, must generally be established in an evidentiary proceeding at which the defendant is afforded an opportunity to contest the amount claimed or upon a review of detailed affidavits and documentary evidence. *See* Fed. R. Civ. P. 55(b)*; Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1992). As noted above, plaintiff was directed to submit papers in support of its damages claim in lieu of a hearing. Defendant failed to submit any papers in opposition, despite the order having been served on him at his last known address.

2

The Claims Against D'Sa:

The complaint in this action seeks damages for the illegal interception of cable television programming signals under 47 U.S.C. §§553(a)(1) and 605(a) of the Cable Communications Policy Act. Those sections prohibit the unauthorized reception of cable television programming services. *See International Cablevision, Inc. v. Sykes,* 75 F.3d 123, 133 (2d Cir. 1996). Section 553, which applies to "unauthorized reception of cable services, provides that "[n]o person shall intercept or receive . . . any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." Section 605(a) applies to "radio transmission" and "communication by radio," and provides that "[n]o person not being authorized by sender shall intercept any radio communication and divulge or publish the . . . contents . . . of such intercepted communication to any person." D'Sa violated both of these sections.

Cablevision Programming and Billing:

Cablevision offers cable television services to subscribers who request and pay for them. Kempton Aff. at ¶ 2. The programming consists of different tiers of cable television programming services, progressing from "Basic," to "Family," to "Optimum," to "Gold," with each step increasing the number of "premium" stations that the subscriber can receive, at a correspondingly higher monthly cost. *Id*. at ¶ 3. The price of subscribing to packages of premium services ranges in cost up to $80.00 per month. *Id.* at ¶ 4. Cablevision subscribers may also elect to subscribe to one or more additional "premium" services such as "Pay Per View" programming, which enables a subscriber to purchase individual movies, sporting events or concerts for a per-event fee. The fee for additional premium services ranges from $1.95 to

3

$14.95 per month, per service, and the fee for pay-per view programming ranges from $3.95 to $54.95 per selection. *Id.* at ¶ 4-5.

Legitimate Cablevision subscribers receive their programming through a converter-decoder that allows reception of whatever level of programming the subscriber has opted to purchase. *Id.* at ¶ 8. To prevent subscribers from receiving programming services for which they have not paid, Cablevision encrypts or "scrambles" the signals for its services, so that when in a scrambled mode, programming services not purchased remain distorted and not viewable on the subscriber's television set. *Id.* at 9. Unauthorized interception of Cablevision's programming can be accomplished by using a "pirate" or modified converter-decoder. *Id.* at ¶ 14.

CSC's claims against the defendant arose following an investigation of a business known as Plazac Sales, Inc. ("Plazac"), located in Union, New Jersey. *Id.* at ¶16. Cablevision suspected that Plazac was engaged in the sale and distribution of "pirate" converter decoder devices. *Id.* Cablevision obtained copies of Plazac's business records in the course of a lawsuit brought against them, and the records revealed that defendant D'Sa had purchased nine descrambling devices from Plazac between February of 2000 and May of 2000. *Id.* at ¶19; Plaintiff's Exhibit "C".

The type of device purchased by D'Sa has been tested and found capable of defeating the encryption technology used by CSC in Nassau County, where D'Sa lived, thus permitting access to all of Cablevision's cable television programming, including its premium and pay per view programming services, without authorization, in violation of 47 U.S.C. §§553(a)(1) and 605(a). *Id.* at ¶ 22-23. Indeed, the sole function of such unauthorized converter-decoders is to enable their users to received unauthorized cable television programming without paying for it;

4

they serve no lawful purpose. *See Cablevision Systems New York City Corp. v. Flores,* 2001 U.S. Dist. LEXIS 9351, at *7 (S.D.N.Y. July 6, 2001)(citing *Time Warner Cable of New York City v. Barbosa,* 2001 WL 118608 *3 (S.D.N.Y. Jan. 2, 2001)). Thus, the facts support a finding that D'Sa violated both sections 553 and 605 of the Communications Act, and the plaintiff is entitled to damages.

Damages:

Where a defendant has violated both sections 553 and 605, a plaintiff may recover damages under one statute or the other, but not both. *See Sykes,* 75 F.3d at 129. The plaintiff opted to receive statutory, rather than actual, damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II), which allows an award of statutory damages for the sale of unauthorized converter-decoders of "a sum not less than $10,000, or more than $100,000, as the court considers just" for each violation. That section also provides for an award of statutory damages for the use of an unauthorized converter-decoder in "a sum of not less than $1,000 or more than $10,000." *See* 47 U.S.C. § 605(e)(3)(C)(i)(II). In addition, the statute requires the court to "direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." §605(e)(3)(B)(iii). Thus, plaintiff seeks an award of $80,000, representing the minimum statutory damages for the sale of eight devices. In addition, plaintiff seeks an additional $1,000, representing the minimum statutory damages for the use of one device, and $2,246.00 as reasonable attorneys' fees.

Because of the defendant's default, there is no way for the court to know precisely how D'Sa used the devices he purchased, and the court must draw all inferences in favor of the plaintiff. *See, e.g., Cablevision Systems of New York City Corp. v. Abramov,* 980 F. Supp. 107,

5

112 (E.D.N.Y. 1997)(on default, plaintiff is entitled to all reasonable inferences from evidence it offers)(citing *AuBon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir. 1981)). Thus, the court will assess damages considering each descrambler as a separate violation.

Section 605(4), which applies to any person who sells or distributes the relevant devices, specifically states that "[f]or purposes of all penalties and remedies established for violations of this paragraph, the prohibited activity established herein as it applied to each device shall be deemed as a separate violation." The plaintiff asks the court to infer that eight of the nine devices were sold or distributed. *See, e.g., Cablevision of Southern Connecticut v. Smith,* 141 F.Supp.2d 277, 287 (D. Conn. 2001)(awarding $195,000 based on presumption that defendant sold nineteen of twenty devices purchased). The court finds that such an inference is reasonable and will assess damages considering each of the eight sales as a separate violation. Thus, the court recommends a minimum award of $10,000 per converter for a total award of $80,000.

Turning to the assessment of the amount of statutory damages to award for the use of the unauthorized decoder by D'Sa, among the relevant criteria are "the amount of money saved by the violator and the revenues lost by the plaintiff." *Dockins,* 1998 U.S. Dist, LEXIS at *18. Because the defendant has defaulted, it is impossible to determine the actual amounts gained by D'Sa or lost by the plaintiff, and an estimate must be made. In this regard, the length of time that the descramblers were in use is significant. The plaintiff alleges that D'Sa became a Cablevision customer on November 11, 1998, when he upgraded his service to the Optimum Preferred Sports programming package. Kempton Aff. ¶ 21. On October 17, 2000, D'Sa downgraded his service to Family Optimum. *Id.* D'Sa purchased the decoders from February 2000 to May 2000 and terminated his Cablevision service on June 20, 2001. *Id.* Here, Cablevision alleges that D'Sa

first received the illegal device in February 2000 and the complaint was filed in May 2002. *Id.* Therefore, damages will be based on a period of 27 months. Thus, for a period of approximately 27 months, the defendant used the decoder to receive the highest level of Cablevision services and access to pay per view events, while paying only the basic or Family Optimum and HBO rates from October 17, 2000 through June 20, 2001, when he canceled altogether. *Id.* The court accepts the plaintiff's claim that the benefit to the defendants at current rates for the enhanced premium services was approximately $80.00 per month, totaling $2,160.00 per converter, minus the $49.95 which D'Sa paid for a period of eight months, totaling $399.60, or $1,760.40 over the 27 month period, per converter.

The benefit to the defendant from the unauthorized access to pay per view events is more difficult to estimate. In *Time Warner Cable of New York City v. LaTrace,* CV-00-1529, Report and Recommendation (VVP) (July 14, 2000), the court assumed that the defendant had watched, on average, two pay per view movies a week or eight per month, at a price of $4 per movie, amounting to a value of $24 per month, and one special event per week or four per month, at an average price of $30 per event, amounting to a value of $12 0 per month. The combined value of the estimated pay per view services is thus $144 per month. *See also Cablevision Systems of New York City Corp. v. Ayala,* 2000 U.S. Dist LEXIS 9612, at *12-13 (S.D.N.Y. July 10, 2000) (finding $10,375 to be a reasonable amount for the pay-per-view selections defendant "might have viewed without making the requisite payment to Cablevision" for a period of 83 months, or approximately $125 per month).

The *LaTrace* approach seems reasonable to the undersigned. Applying the figures used in *La Trace* to the 27 month period of use at issue here, an additional $3,888 in illicit usage per

7

converter must be considered in estimating the damages ($144 per month x 27 months = $3,888). Thus, the estimated damages per converter amount to $1,760.40 (programming services) plus $1,760.40 (pay per view services) for the entire period, or $5,648.40 per converter. Since this amount exceeds the amount that the plaintiff is seeking in statutory damages, the court awards the plaintiff $1,000 for violation of the statute for the defendant's personal usage of one converter.

Attorneys' Fees:

The court also recommends that the plaintiff be awarded $4,892.00 in attorneys' fees, pursuant to §605(e)(3)(B)(iii). The plaintiff has supported its request with the requisite documentation showing, for each attorney, the "date, the hours expended, and the nature of the work done," and the court finds it to be reasonable. *See New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1154 (2d Cir. 1983).

The plaintiff is directed to serve a copy of this Report and Recommendation on Mr. D'Sa by certified mail, and to file proof of such service with the court.

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within ten days after service the Report. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
      August 10, 2005                                                                         /s/

                                                                      ARLENE R. LINDSAY
                                                                      United States Magistrate Judge